John S. **FOWLER** et al., Appellants,

v.

**UNITED STATES** of America,
Appellee.

No. 17881.

United States Court of Appeals
Eighth Circuit.

Nov. 4, 1965.

William H. Bowen, Little Rock, Ark., for appellants.

James W. Gallman, Asst. U. S. Atty., Little Rock, Ark., Robert D. Smith, Jr., U. S. Atty., Little Rock, Ark., for appellee.

Charles O. Galvin, Dallas, Tex., amicus curiæ.

Before VOGEL, MATTHES and RIDGE, Circuit Judges.

VOGEL, Circuit Judge.

John S. Fowler and his wife, Jimmie Lea Fowler, appellants herein, were indicted and convicted in a jury trial on three separate counts for evasion of federal income taxes for the years 1957, 1958 and 1959 in contravention of 26 U.S.C.A. § 7201.[1] On the three counts John S. Fowler was fined $2,000 and sentenced to 90 days' imprisonment. Additional sentence was suspended but Fowler was ordered placed on probation for a two-year period beginning with his release from prison. Jimmie Lea Fowler was fined $2,000 and placed on probation for a two-year period. Appellants perfect this appeal from the judgments of conviction.

Appellants were indicted for knowingly and willfully filing false and fraudulent income tax returns, with intent to evade and defeat substantial portions of their income tax liability for the years 1957, 1958 and 1959, by substantially understating their true taxable income and income taxes due thereon. Appellants were charged in the indictment with stating their 1957 taxable income as being $820.90 and their 1957 tax due and owing as being $164.18, whereas the figures should have been $10,747.99 and $2,677.-98, respectively. For 1958 appellants reported a taxable income of $147.18 and a tax due and owing of $29.44, whereas these figures allegedly should have been $19,399.27 and $5,359.25, respectively. For 1959, it was charged that appellants had taxable income of $43,056.80 and a tax due and owing of $16,523.40, whereas they reported only $3,973.18 and $943.52, respectively.

Prior to and during the indictment period appellants resided in North Little Rock, Arkansas, and derived income from the Broadway Motel and Restaurant and from other small hotels and motels owned by them. Appellants also earned income from other rental property and sources in or near Little Rock and North Little Rock, Arkansas. Dorothy Calva, a daughter-in-law of appellants, and appellant Jimmie Lea Fowler maintained two sets of books, one applying to the Broadway Motel and Restaurant and the other, with appropriate divisions, applying to the remaining hotels and rental properties. Neither Dorothy Calva nor Mrs. Fowler had any formal training as bookkeepers. The books apparently can best be described as being a single entry system with columnar headings. Receipts were recorded and general business expenses were classified in the books.

The government proceeded under the net worth plus nondeductible expenditures method of proof for showing income tax evasion. The net worth method of proof is described in Holland v. United States, 1954, 348 U.S. 121, 125, 75 S.Ct. 127, 130, 99 L.Ed. 150, as follows:

"In a typical net worth prosecution, the Government, having concluded that the taxpayer's records are inadequate as a basis for determining income tax liability, attempts to establish an 'opening net worth' or total net value of the taxpayer's assets at the beginning of a given year. It then proves increases in the taxpayer's net worth for each succeeding year during the period under examination and calculates the difference between the adjusted net values of the taxpayer's assets at the beginning and end of each of the years involved. The taxpayer's nondeductible expenditures, including living expenses, are added to these increases, and if the resulting figure for any year is substantially greater than the taxable income reported by the taxpayer for that year, the Government claims the excess represents unreported taxable income. * * "

In the instant case net worth was determined as of January 1, 1957, December

1. Under this section:

"Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution."

31, 1957, December 31, 1958, and December 31, 1959. Net worth for prior years was also determined to further substantiate the figure of January 1, 1957. Further facts will be set out as needed.

## I

Appellants contend there was non-compliance with the edict in Holland v. United States, supra, that the concept of the net worth approximation of income " * * * is so fraught with danger for the innocent that the courts must closely scrutinize its use." 348 U.S. 125, 75 S.Ct. 130. Appellants feel that the government did not correctly apply, and that the trial court did not correctly interpret, the net worth method as a matter of law. More specifically, appellants allege, in substance, the following enumerated errors:

▬ 1. Appellants contend that the government agents erred in that they admitted their net worth computation did not consider accounts receivable as an asset nor accounts payable as a liability in determining net worth as of January 1, 1957. There was no error here. Appellants admit that they were on a cash basis for purposes of paying income taxes. The government was bound to follow appellants' method of accounting in computing taxable income. Morrison v. United States, 4 Cir., 1959, 270 F.2d 1, certiorari denied, 361 U.S. 894, 80 S.Ct. 196, 4 L.Ed.2d 150. Under a cash basis method, accounts receivable and payable are not included as part of net worth. As stated in United States v. Vardine, 2 Cir., 1962, 305 F.2d 60, 64:

" * * * If a taxpayer disregards his accounts payable in reporting income on his annual tax return, i. e., reports as a cash basis taxpayer, then the government in computing his net worth in order to check the income reported on his tax return must also disregard these amounts."

▬ 2. In arriving at what were non-deductible personal expenses as opposed to what were deductible business expenses (the former being added to net worth), appellants contend that the investigating agent for the government made his decision simply by examining the faces of the checks reflecting the expenditures. The facts do not bear appellants out on this point. The appellants themselves identified most of a list of 535 checks submitted to them for identification during the investigation. Many of the checks used to pay for personal expenses had a notation in the form of the word "personal" written on them. It appears that the government's characterization of the checks was primarily based on the appellants' own characterization of the nature of the expenditure and on the obvious nature of the items purchased with the checks (such as clothing from a department store). The government had the burden of persuasion to establish characterization of the checks in proving net worth. Mighell v. United States, 10 Cir., 1956, 233 F.2d 731, certiorari denied, 352 U.S. 832, 77 S.Ct. 47, 1 L.Ed.2d 52. Here the government met this burden in light of the evidence discussed. The jury could reasonably have agreed with the government's classification.

▬ 3. By way of illustration, appellants make the following accusation against the trial judge, who they allege was hindering appellants' attack against the use of the net worth method:

" * * * Disregarding the clear mandate of and caution expressed by the Supreme Court in Holland, the trial Court cut off an attempt by the expert of the taxpayers [Mr. Raymond R. Morris] to demonstrate one pitfall to accuracy of the net worth statement—the absence of the check and balance available in any double entry system of accounting. This next related exchange made crystal clear to the jury that the trial Court thought well of the net worth technique and would brook no attack upon it: (R. 746–747)

"The Court: Now wait a minute. You say there are no checks or balances on the accuracy of a

balance sheet or net worth computation?

"Mr. Bowen [appellants' counsel]: No, contrasted, your Honor, with a double entry system of bookkeeping.

"The Court: An accountant or no, there are some checks on any system. You at least can add it up twice. Let's not go that far, gentlemen, Go ahead and qualify your statement; I'm afraid I don't understand all the qualifications.

"Here the Court not only challenged any attack upon the accuracy of the technique, it equated the net worth computation with a balance sheet which is broadly and widely accepted in business and commerce."

Appellants failed to quote what took place immediately prior to this:

"Q. Mr. Morris, the practice to this [single entry bookkeeping] system [used by appellants] says it is approved by tax authorities and auditors and recommended by leading accountants; is this single entry system a type that you would recommend or install?

"A. No, sir, I wouldn't. Now, I might add that probably that refers to the book itself, that so far as the columns are concerned and the income and expense allocation, it can be converted into a double entry system; but the breakdown and maintenance of those books, if the information is put on correctly, would reflect the income. Now, I might add this, that the only difference between a double entry set of books and a single entry is a determination of mathematical accuracy of those books. *If a single entry and everything put down correctly it will reflect the correct result; but it's just like adding two columns of figures, put the same figures down twice and add them twice. It's for the purpose of seeing your totals are right in the first place; so if you put down everything in the credit and every-thing in the debit and add them up together you know they will come out. That is the mechanical accuracy and not the accuracy of the figures themselves.*

"Q. So this single entry system that was here used is an accurate system if all the details are correct, but there is no way to check because you don't have the double entry.

"A. No way to check the mechanical accuracy.

"Q. How would you characterize the net worth estimate of income; is it a single or double entry approach to analyzing income?

"A. Actually, single entry if they substitute for determining, attempting to determine the amount of income that may be realized by a particular taxpayer over a period of time.

"Q. So that there are no checks and balances then on the accuracy of a net worth system either, are they?

"A. I think it——" (Emphasis supplied.)

The trial court, far from intruding into appellants' attack on the net worth system, was attempting only to clarify and to amplify what Mr. Morris had himself previously brought out. The jury, as is clearly evidenced in the nearly 1,000-page record, was given much in the way of detailed analysis throughout this case. It would only be natural for the judge to attempt to pin down what the witness himself had already alluded to. Appellants' counsel apparently recognized this for he stated in the record at a point immediately following the portion of the record objected to by appellants:

"Let's review then this area, because I think the Court's interest makes it important to us and the jury that we understand it."

Thereupon Mr. Morris was permitted, without further "intrusion" by the court, to make his position clear to the jury.

As to other contentions by the appellants that Mr. Morris was unfairly rebuked in not being able to set out all of

his opinions and to explain all of his statements, we note that the record contains many instances where Mr. Morris was not responsive and where he tended to give very long and sometimes irrelevant answers. The record fully supports Judge Henley's assertion in his Memorandum Opinion that:

"As far as Mr. Morris is concerned, the Court has already commented to some extent about what transpired in the course of the testimony of that witness. The Court will add at this point that it is not conscious of having done anything or said anything which would reflect on Mr. Morris or on his credibility as a witness or which would demean him as a witness in the eyes of the jury. As indicated, the Court did instruct Morris to answer the questions put to him. In the trial of a criminal case, and particularly in the trial of long cases such as this one, the Court not only has the right but also the duty to keep the testimony within reasonable bounds and not to permit a witness to digress."

Read as a whole, the record clearly indicates that the court was concerned only with clarifying the issues and with aiding the jury's understanding. Witnesses for both sides were treated equally insofar as the judge was attempting to provide for an effective presentation of the issues involved.

4. In an effort to overcome that part of the "bulge" shown between appellants' opening and closing net worth on which taxes were not paid, appellants allege there should be taken into consideration a previously unreported depreciation deduction to take care of increased obsolescence of certain properties of appellants which took place during the years in controversy. Appellants' accountant, Mr. Howard Pratt, who made out appellants' tax returns, had used a conservative straight-line method of depreciating capital assets owned by appellants. Appellants alleged that such straight-line depreciation did not fairly cover the obsolescence of certain properties of appellants, which obsolescence was caused by the building of interstate highways in the area. Although plans for the highways were disclosed by the newspapers as early as March 21, 1956, no parts of the highways were completed until the 1960's. It is appellants' contention that with these new highways being planned during the indictment years, the straight-line method did not adequately take into account the fact that appellants' overnight lodging properties would become obsolete at a faster rate than originally anticipated (since the properties abutted former main thoroughfares), and that this obsolescence could be deducted as a matter of law at trial to aid in defeating the net worth bulge.

The following instruction, requested by appellants, was given to the jury:

"Some evidence has been introduced relative to alleged obsolescence. You are instructed in connection with obsolescence that if facts upon which a conclusion of obsolescence may be based are known during or prior to the year or years in issue, this factor may be utilized by the defendants although not incorporated in their tax returns."

Appellants were entitled to no more than this instruction for there was not obsolescence as a matter of law. As stated by the Supreme Court in Real Estate-Land Title & Trust Co. v. United States, 1940, 309 U.S. 13, 17, 60 S.Ct. 371, 373, 84 L.Ed. 542:

" * * * For obsolescence under the [Internal Revenue] Act requires that the operative cause of the present or growing uselessness arise from external forces which make it desirable or imperative that the property be replaced. What those operative causes may be will be dependent on a wide variety of *factual* situations. * * * " (Emphasis supplied.)

Cf., Keller Street Development Co. v. Commissioner of Internal Revenue, 9 Cir., 1963, 323 F.2d 166. There was evi-

dence in the record, obviously believed by the jury, that there should not have been increases in deductions for obsolescence for the years in controversy. An example of such evidence is that in 1959 appellants were able to obtain a $100,000 loan from a savings and loan institution, indicating that the so-called "obsolete" property certainly did have certain security value. The extent of the value and the amount of obsolescence, as viewed from the indictment years, was, then, clearly a jury question. As stated in Mertens Law of Federal Income Taxation, Vol. 4, § 23.102, at pp. 210–211 (Rev. Ed. 1960):

"* * * The purpose of allowing a deduction for obsolescence is to permit the taxpayer a return of his capital out of earnings over the economic useful life of the property notwithstanding its possibly longer physical life or ordinarily useful life. The foundation for obsolescence is the expected early abandonment of the property, which for this purpose means the scrapping of the property and not the sale, at a time when it had substantial value and was to be used for other purposes. *The deduction for obsolescence is, accordingly, not properly allowable in the absence of a showing that (1) there are substantial reasons for the belief that the property would become obsolete prior to the end of its ordinary useful life,* and (2) there is a reasonable degree of certainty, under all the available facts and circumstances, as to when that event would probably occur." (Emphasis supplied.)

It is interesting to note, also, that a summary showing the extent of obsolescence, prepared by witness Morris, was not presented at trial but, rather, appellants attempted to present Mr. Morris' summary through an affidavit filed with the motion for judgment of acquittal or a new trial. There is no reason given by appellants as to why Mr. Morris' summary could not have been presented before the jury at trial.

■ 5. Relating to depreciation other than obsolescence, the appellants charged that the trial court erred in not allowing witness Morris, except for purposes of showing appellants' intent, to testify as to how appellants could have taken greater depreciation (through recomputing the useful life of certain assets) during the years in controversy so as to reduce the net worth bulge for those years. Appellants cite § 1.167(a)–1(b) of the Treasury Regulations in support of their proposition. That regulation provides:

"* * * The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and *shall be redetermined when necessary regardless of the method of computing depreciation.*" (Emphasis supplied by appellants.)

Without dealing with the validity of this regulation, it is only necessary to point out that in the years involved appellants did not elect to recompute the estimated remaining useful life of the assets involved. Nobody is contending that they could not have done so at that time. Appellants evaded their taxes years ago and they cannot, some eight to ten years later, now attempt to justify their evasion by recomputing the useful life of certain then-existing assets. Appellants at that time elected one method of determining depreciation and that election binds them for purposes of this action.

■ 6. Appellants contend that their net worth for 1959 should be decreased by $1,700, the amount paid out for attorney's fees for, and in settlement of, a suit brought by a waitress at the Broadway Restaurant against appellant John S. Fowler. This expense was treated by the government as a non-deductible personal expenditure, even though appellants showed it on their returns as a legal expense. Through testimony of appellants' own witness it was established that the incident arose at a time when the Broadway Restaurant was being leased by the Fowlers to Ann Harris. On November 8, 1958, Mrs. Harris phoned Mr. Fowler and told him that the

waitress involved was drunk on the job. At the request of Mrs. Harris, the lessee, Mr. Fowler "escorted" the waitress out of the back door of the cafe. The waitress sued Mr. Fowler for $80,000, and, after a mistrial, the settlement was reached. The court allowed testimony on this incident although, because of appellants' objection, the waitress herself was not allowed to testify since possible prejudicial effects might have arisen. Appellants' witness Dorothy Calva did testify as to the incident however. It was for the jury to determine whether or not this expense was personal or business since, as a matter of law, there was no uncontroverted showing that this incident arose out of Mr. Fowler's business as opposed to being a non-deductible personal tort. Pantages Theatre Co. v. Welch, 9 Cir., 1934, 71 F.2d 68. If anything, the incident more likely arose out of Mrs. Harris' business.

7. In determining appellants' opening net worth, the government assigned a value of $2,000 to cash on hand based on certain admissions made by the appellants at the time the investigation against them commenced. Corroboration is required of admissions made after the fact of the crime in controversy, where such admissions embrace an element vital to the government's case. Smith v. United States, 1954, 348 U.S. 147, 155, 75 S.Ct. 194, 99 L.Ed. 192; Smith v. United States, 8 Cir., 1956, 236 F.2d 260, 265, certiorari denied, 352 U.S. 909, 77 S.Ct. 148, 1 L.Ed.2d 118, rehearing denied, 353 U.S. 989, 77 S.Ct. 1280, 1 L.Ed.2d 1147. Sufficient corroborative evidence was present in the instant case to support the admissions made by appellants concerning their cash on hand. Cash on hand was used by appellants primarily to meet the demands of a check-cashing service and the largest exchange of checks for cash for any one day was well within the $2,000 claimed. The reasonableness and accuracy of the $2,000 figure was further confirmed through the analysis of appellants' bank accounts, the analysis of a 1955 Small Business Administration loan application filed by appellants, and the analysis of a 1959 loan application filed by the appellants at a savings and loan association. The Small Business loan application was filed before the crimes in controversy occurred and thus the admissions made by appellants on such application need not be corroborated. Warszower v. United States, 1941, 312 U.S. 342, 347, 61 S.Ct. 603, 606, 85 L.Ed. 876. As stated in the recent case of United States v. Mackey, 7 Cir., 1965, 345 F.2d 499, 506:

"Whether defendant had substantial sums of cash at the starting point is a matter within defendant's knowledge. Under circumstances such as those in this case, where Government conducted a thorough investigation and failed to uncover evidence of cash on hand, the burden is on defendant to come forward with evidence of cash and he remains quiet at his peril. See Holland v. United States, 348 U.S. 121, 138–139, 75 S.Ct. 127, 99 L.Ed. 150 (1954) and United States v. Holovachka, 7 Cir., 314 F.2d 345, 354 (1963)."

In the instant case the government conducted such a thorough investigation. Appellants failed to come up with any affirmative off-setting evidence. This was ultimately a question for the jury. United States v. Ford, 2 Cir., 1956, 237 F.2d 57, 63, reversed on other grounds, 355 U.S. 38, 78 S.Ct. 114, 2 L.Ed.2d 71.

8. Finally, appellants argue that there is error in the net worth analysis in that it fails to take into account, so as to reduce the net worth bulge, the so-called check float—i. e., checks that were written in one year and which did not clear until the next year. The appellants further argue that money allegedly left with the Fowlers by one Bill Landers in trust was not properly treated in computing net worth for 1958 and 1959. Other significant errors, according to appellants, concern the treatment of an installment loan taken by appellants in 1958 and the omission of certain automobiles in computing the Fowlers' assets and expenditures.

Except possibly as relating to the check float, we believe that it was a jury question as to the points raised by appellants. From the evidence the jury could have reasonably believed that the government acted correctly in dealing with the above-stated matters. Perhaps under the authority of United States v. Vardine, supra, the check float as a matter of law should be utilized to reduce the unexplained net worth bulge.[2] It should be noted that in the instant case there was no evidence of when the checks were delivered to the payees or no evidence to show whether or not the checks went to reduce existing liabilities (which would off-set, to the extent of any liability decrease, any error for not including check float as a reduction of assets).

Even assuming that appellants are correct in all matters relating to the trust fund, the loan, the automobiles and the check float, there was no prejudicial error here. As the computation in footnote [3] shows, there was still substantial

2. In Vardine, the court stated, at page 65 of 305 F.2d:

"* * * The trial judge left it up to the jury whether to deduct these outstanding checks from the defendant's year-end checking account balance, and the government, on their net worth summary, showed the balance as it stood on the bank's books. This was error. When a cash basis taxpayer delivers his check without any limitation on the payee's ability to cash it immediately, the taxpayer is entitled to a deduction at the time of delivery. Clark v. Commissioner, 253 F.2d 745 (3 Cir. 1958)."

3. This computation combines Government Exhibit No. 44 with pertinent aspects of the Morris computation attached to appellants' motion for acquittal and, in the alternative, for a new trial. For purposes of this computation we have accepted all of appellants' corrections as to the trust fund, the loan, the automobiles, and the check float. Even read as redone, the exhibit makes it clear that appellants substantially understated their taxable income for 1957, 1958 and 1959.

| | Balance Jan. 1, 1957 | Balance Dec. 31, 1957 | Balance Dec. 31, 1958 | Balance Dec. 31, 1959 |
|---|---|---|---|---|
| Net worth per Exhibit #44 * | $96,915.77 | $106,410.72 | $123,852.61 | $165,370.56 |
| Outstanding checks * | (1,064.10) | (4,255.70) | (3,527.00) | (4,615.41) |
| Bill Landers' "trust fund" * | | | 1,450.00 | |
| Oldsmobile * | 2,243.71 | 2,243.71 | | |
| '58 Cadillac * | | | 6,743.71 | |
| '59 Cadillac * | | | | 6,245.68 |
| Loan due bank * | | | (3,847.90) | (1,417.66) |
| Total net worth | 98,095.38 | 104,398.73 | 124,671.42 | 165,583.17 |
| Prior net worth | | 98,095.38 | 104,398.73 | 124,671.42 |
| Increase in net worth | | 6,303.35 | 20,272.69 | 40,911.75 |
| Adjusted personal expenditures ** | | 3,037.10 | 3,786.00 | 10,572.70 |
| Subtotal | | 9,340.45 | 24,058.69 | 51,484.45 |
| Less non-taxable receipts per Exhibit #44 * | | (812.06) | (3,504.87) | (3,594.47) |
| Corrected net (taxable) income of appellants | | 8,528.39 | 20,553.82 | 47,889.98 |
| Reported net income of appellants * | | (2,466.15) | (1,496.87) | (5,747.98) |
| Understatement of income | | 6,062.24 | 19,056.95 | 42,142.00 |

* These are figures accepted and used by Morris in his computation.

** This uses as a basis Government Exhibit No. 44 and reflects payments on loan liability and adjustment for personal auto using the figures provided by Morris.

evidence of tax evasion even if we accept appellants' contentions in these areas.

■ In summary, then, we feel there was no substantial prejudicial error present so as to support the claim of appellants that the net worth computation in this case was not properly prepared by the government or properly ruled on by the trial court. As stated by this court in Smith v. United States, supra, at page 264 of 236 F.2d:

"* * * [t]he government is not required to show the exact amount of error. If the understated taxable income be substantial, that is sufficient because the exact amount is not the gist of the offense. Cave v. United States, 8 Cir., 1947, 159 F.2d 464, 468."

Certainly, as is evidenced by the computation set out in f. n. 3, supra, there was a substantial understatement of taxable income by appellants herein. The government followed the guidelines set out in the Holland case, supra, at pages 135–136 of 348 U.S., page 135 of 75 S.Ct., where it is stated:

"* * * When the Government rests its case solely on the approximations and circumstantial inferences of a net worth computation, the cogency of its proof depends upon its effective negation of reasonable explanations by the taxpayer inconsistent with guilt. Such refutation might fail when the Government does not track down relevant leads furnished by the taxpayer —leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence."

In the instant case the bookkeeping system of appellants was inadequate and the government had little choice but to resort to proof of tax evasion through the introduction of circumstantial evidence. The record clearly points out, however, that the government did follow up on all substantial leads and thus protected the rights of appellants. The trial court correctly instructed on the net worth method of proof and there can be no claim of error here.

## II.

As alluded to earlier in this opinion, appellants strongly urge that there was undue intrusion by the court in conducting the trial. Also appellants contend that the government made improper references in its closing argument so as to deny them a fair trial. A perusal of the nearly 1,000-page record indicates that such allegations are without merit. One example of intrusion raised by appellants concerned the court's actions during the testimony of Raymond R. Morris. This matter has already been discussed and determined adversely to appellants. Other examples raised by appellants, when taken in context, are equally without merit. The duty of a federal judge in a criminal case has been described by this court in Franano v. United States, 8 Cir., 1962, 310 F.2d 533, 537, certiorari denied, 373 U.S. 940, 83 S.Ct. 1545, 10 L.Ed.2d 694, to be as follows:

"There can be no doubt that a federal judge in a criminal case is more than a mere moderator and may assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence and by expressing his opinion upon the facts, provided he clearly states to the jury that all matters of fact are submitted to their determination. Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933); Northcraft v. United States, supra, 271 F.2d [184] at 188–189; Myres v. United States, 8 Cir., 174 F.2d 329, 338 (1949), cert. denied, 338 U.S. 849, 70 S.Ct. 91, 94 L.Ed. 520 (1949); Buchanan v. United States, 8 Cir., 15 F.2d 496, 497–498 (1926). However, since a trial judge's influence upon a jury is necessarily of such great magnitude, a trial judge should exercise care and discretion in expressing an opinion so as not to mislead or, in effect, to destroy the jury's right as the sole arbiters of all fact ques-

tions. Quercia v. United States, supra, 289 U.S. at 470, 53 S.Ct. at 699; Holmes v. United States, 4 Cir., 271 F.2d 635, 639 (1959); Stoneking v. United States, 8 Cir., 232 F.2d 385, 389–390 (1956), cert. denied, 352 U.S. 835, 77 S.Ct. 54, 1 L.Ed.2d 54 (1956); Cook v. United States, 8 Cir., 18 F.2d 50, 52 (1927)."

See, also, United States v. DeFillo, 2 Cir., 1958, 257 F.2d 835, 839–840, certiorari denied, 359 U.S. 915, 79 S.Ct. 591, 3 L.Ed.2d 577. Clearly these duties were followed by Judge Henley in this case.

The reference made by the government in closing argument to which appellants object is as follows:

"Well, I think now we can get to the point of what defense has left after we look at that. They have a long series of theories, obsolescence, depreciation, explanations, rationalizations, policies, excuses. Every crime committed can be explained away or excused. There's no question about that. But this case, then, becomes quite simple. Do you want to forgive these people or do you not want to forgive them? But why not? Everybody cheats a little bit on their income tax. The Government case, it's so complicated, I can't understand it, or how can we be sure they didn't make a mistake? So here's the answer to those questions. The law makes tax evasion a crime. We have proven tax evasion. Now, it's up to you to do, as you are sworn to do, a true deliverance and verdict make. You and each of you have got to look into your own conscience and ask: Am I going to stand on the side of good or am I going to stand on the side of evil. Today we hear much of moral decay. If such is happening it is because we each are failing in our responsibility. It would have been much easier for me to stay in that seat and sit there and be an observer, to stay on the sideline, but my conscience told me about three days ago that I couldn't sit idly by and not let you folks know how I feel about this case."

In view of all the testimony in this case, in view of the pertinent instructions provided by Judge Henley, and in view of the closing arguments as a whole, this argument was not so offensive or prejudicial as to prevent the jury from exercising freedom of judgment and thought in its deliberations. Isaacs v. United States, 8 Cir., 1962, 301 F.2d 706, 738, certiorari denied, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58.

## III.

■■■ Appellants, neither of whom chose to testify, maintain that there was no showing in any event that they had or could have willfully evaded their income taxes for the years in question. As stated by the Supreme Court in the Holland case, supra, at page 139 of 348 U.S., page 137 of 75 S.Ct.:

"A final element necessary for conviction is willfulness. The petitioners contend that willfulness 'involves a specific intent which must be proven by independent evidence and which cannot be inferred from the mere understatement of income.' This is a fair statement of the rule. Here, however, there was evidence of a consistent pattern of underreporting large amounts of income, and of the failure on petitioners' part to include all of their income in their books and records. Since, on proper submission, the jury could have found that these acts supported an inference of willfulness, their verdict must stand. Spies v. United States, supra, [317 U.S. 492] at pages 499–500 [63 S.Ct. 364, 368, 87 L.Ed. 418]."

Accord: Smith v. United States, 1954, 348 U.S. 147, 157, 75 S.Ct. 194, 99 L.Ed. 192. Willfulness and fraudulent purpose are questions for the jury. United States v. Vardine, supra, 305 F.2d at 63; United States v. Schenck, 2 Cir., 1942, 126 F.2d 702, 707, certiorari denied, sub. nom.

Moskowitz v. United States, 1942, 316 U.S. 705, 62 S.Ct. 1309, 86 L.Ed. 1773.

Certainly there was sufficient evidence presented here to submit the question of willfulness to the jury. The government, although only prosecuting appellants for the years 1957 through 1959, presented evidence of the financial condition of appellants from 1954 through 1959. It was shown that appellants had a pattern of failing to report large amounts of income and that large sums of income were not recorded in their books and records. Appellants apparently did not inform their tax return preparer, Mr. Pratt, of all of their income. The evidence showed appellants maintained a high standard of living throughout the indictment period. There was substantial evidence for a jury to find the requisite intent and willfulness to uphold the conviction herein.

 Much is made of the fact that appellants John S. Fowler and Jimmie Lea Fowler had only a third- and eighth-grade education respectively. The gist of this assertion, apparently, is that appellants were thus not capable of forming the requisite intent to evade taxes. This is obviously fallacious reasoning. Appellants were apparently intelligent enough to operate a series of successful businesses and did very well at it. This being so, they could certainly plan to evade tax obligations. One's capacity is measurable by more than just his formal education. Furthermore, the government correctly points out the following in its brief:

"The appellants first assert that the lack of formal schooling is relevant in determining intent, and we note that the support of the statement that John S. Fowler quit school in the third grade and Jimmie Lea Fowler went only to the eighth grade depends upon the opening and closing statement of their counsel, plus the statement of the investigating agent that they appeared to have no great formal schooling. The applications submitted to the government for a loan (Government Exhibit No.

9 * * *) reflect the statements that Mr. Fowler had three years of high school education and Mrs. Fowler had the equivalent of a high school education."

Related to this, it is claimed that when appellants were advised of their constitutional rights at the beginning of the investigation they did not understand what they were. The investigating agent gave uncontroverted testimony that when he told appellants of their constitutional rights Mr. Fowler claimed not to understand him. The following was then testified to by the investigating agent on cross-examination:

"A. I believe it was the first time anyone had told me after I explained their rights that they didn't understand.

"Q. Well, what was the example that you used to make him understand about it?

"A. I tried to think of the simplest example that I could.

"Q. What was that example?

"A. And I told him that neither of them were sixty-five, that had they filed a claim for Social Security benefits claiming that they were sixty-five, that that would be a false claim; and that should I come along then and ask them anything about their age they would have the right to decline to answer or give me any information pertaining thereto, because that would be a criminal offense.

"Q. And you made reference to the fourt [sic] and fifth amendments?

"A. Yes, sir.

"Q. Of the United States Constitution?

"A. Yes, sir.

"Q. Did you explain to him what the Fourth and Fifth Amendments were?

"A. I did not go into detail; I told them under the Fourth and Fifth Amendments they had the

right to decline to answer or furnish me with any information.

"Q. In other words, after you gave them this example, even though Mr. Fowler has only a third grade education, or at least he quit in the third grade, he knew that you were a person who might in your work products substantiate a charge of criminal tax evasion against him, did he not; he knew that from the very beginning, did he not?

"A. I hope he did.

"Q. If he didn't, your example wasn't very good?

"A. Yes.

"Q. And you thought your example was clear, it was simple?

"A. I hoped it was made simple.

"Q. And Mrs. Fowler you thought understood, then from this first interview, that she was in danger of criminal prosecution?

"A. She offered no statement when I asked if they understood their rights; she offered no statement that she did not; only Mr. Fowler.

"Q. You were satisfied, as it is your duty to be satisfied, that they knew that criminal investigation was underway?

"A. Yes, sir."

The testimony would indicate that the agent went into much detail and made a great effort to tell appellants of their constitutional rights. It is difficult to believe that appellants did not voluntarily waive any constitutional objections in light of the agent's detailed explanation to them. Appellants were not incapable of understanding, as evidenced by their ability to operate their properties, and it is doubtful if anyone could have ex-

plained their constitutional rights to them any more clearly than did the investigating agent. No claim is made that the agent coerced the appellants, actually or impliedly, during the course of the investigation.

IV.

At one time in this prosecution the government had apparently intended to corroborate its net worth analysis with an analysis of appellants' bank account. Appellants' counsel was so advised after filing for and receiving an order requiring a bill of particulars. For some reason or another, the government did not use the bank deposit account approach as corroboration for its net worth analysis at trial and appellants now claim this was error. At the minimum, appellants feel they were entitled to an instruction, which the trial court declined to give, that the jury was entitled to infer the bank deposit method, if used, would have been unfavorable to the government.

We do not agree. As mentioned already, the government sufficiently corroborated the net worth analysis during trial. Nowhere is there authority for the proposition that the government must prove its case by every possible method. True, the government did indicate to appellants that it intended to utilize bank deposit analysis at trial. However, it is not claimed by appellants that the failure by the government to do so was prejudicial to them. In fact, the appellants had access to the government's bank account analysis and to the documents making up such analysis. If vital to their defense, appellants could have presented this evidence themselves since the evidence was equally available to both parties. The trial judge did not abuse his discretion in refusing to give the requested instruction.[4]

4. We concur with the following from II Wigmore on Evidence, 3d Ed., § 228, pp. 169–171, feeling that it applies to failure to produce evidence as well as to failure to call witnesses:

"It is commonly said that no inference is allowable where the person in ques- tion is *equally available* to both par- ties; * * * the more logical view is that the failure to produce is *open* to an inference *against both parties,* the particular strength of the inference against either depending on the circum- stances."

## V.

The final point raised by appellants which will be dealt with here concerns the admissibility into evidence of statements made by appellants to their accountant, and of extra-judicial statements made by appellants since appellants were spouses and allegedly could not testify against each other in open court. Bouschor v. United States, 8 Cir., 1963, 316 F.2d 451, clearly indicates the reluctance by the courts to protect the client from testimony by the tax consultant. Appellants admit as much in their brief. The husband-wife privilege does not apply, as is the case herein, where the communications were made to third parties and were thus not confidential and where the statements related to joint affairs. Here each party was the agent of the other in making the joint income tax returns, in applying for loans and in all pertinent matters involved in this case. As pointed out in McCormick on Evidence, 3d. Ed., § 84, at pages 172–173:

" * * * Communications in private between husband and wife are assumed to be confidential unless the subject of the message or the circumstances show to the contrary. It is confidential if it was expressly made so, or if the subject is such that the communicating spouse would probably desire that the matter be kept secret, either because its disclosure would be embarrassing or for some other reasons. * * * The fact that the communication relates to business transactions tends to show that it was not intended as confidential. Examples are statements about business agreements between the spouses, or about business matters transacted by one spouse as agent for the other, or about property, or conveyances. Usually such statements relate to facts which are intended later to become publicly known. To cloak them with privilege when the transactions come into litigation would be productive of special inconvenience and injustice."

It should also be pointed out that here neither spouse was called on to testify against the other.

## VI.

We have examined all of appellants' contentions with care and find no prejudicial error. Appellants were fairly tried and found guilty on substantial evidence.

This case is in all things affirmed.