**UNITED STATES of America,
Plaintiff,**

v.

**C. Walton LILLEHEI, Defendant.**

**No. 3–72 Cr. 114.**

United States District Court,
D. Minnesota,
Third Division.
April 20, 1973.

------

Robert B. Renner, U. S. Atty., D. Minnesota, for plaintiff.

Maun, Hazel, Green, Hayes, Simon & Aretz, by Jerome Simon, St. Paul, Minn., Caplin & Drysdale, by Mortimer M. Caplin, Washington, D. C., for defendant.

NEVILLE, District Judge.

Dr. C. Walton Lillehei, formerly a salaried professor in the medical school at the University of Minnesota and now presently and since 1969 in a similar or higher capacity at Cornell University in New York City, was on April 13, 1972 charged in a five-count indictment with wilfully and knowingly filing false and fraudulent income tax returns for the years 1964 through 1968. As a University Professor the doctor was permitted to treat outside patients for fees, which fees did not clear through the University. Such records as the doctor kept were maintained at an office in his home. The government presented evidence that a substantial portion of this outside patient income received in the years involved was not reported on the defendant's income tax returns; that other items of income were omitted, including interest and reimbursed amounts for travel and expenses and that deductions were fraudulently stated and included in the returns. The government presented evidence from which the jury could find that defendant over the five-year period misstated his income (as corrected) by omitting in all some $262,000 of income on which he owed an income tax of (without penalty and interest) $127,437.42.

Both defendant's 1964 and 1965 returns were late filed and his three returns for 1966 through 1968 were filed simultaneously through the office of his attorneys in May of 1969, testified to by the attorney to have been prepared by him from information furnished by the defendant. All are claimed by the government to be false and fraudulent. They each contained a check mark in the appropriate blank that defendant was reporting on a cash basis, which is the basis used by the government in reconstructing what it asserted to be his corrected income and tax due.

The jury trial consumed some five weeks and a verdict of guilty on all counts was returned on February 16, 1973. The government called some 164 witnesses and the defendant 16. The prosecution case in addition to stressing the failure to report patient fees totalling $210,286.94, for the five years, rested on the failure of defendant to report certain other income known as honoraria and miscellaneous fees for lectures and seminars conducted by the defendant and editing work done for a medical magazine in the amount of $10,725.00, the omission of certain interest income totalling $5,594.00, the failure to report the rather substantial amount of $16,752.00 for reimbursed travel expense for which the doctor had claimed a deduction and more particularly a long list of some 40 or more deductions (some involving the same persons over the successive years) which were mischaracterized and falsely listed totalling in all $14,888.00 as business deductions and $4,588.00 as false charitable contributions.

On the alleged unreported patients fees, one of the government agents testified to two and one-half months spent examining microfilm at the bank where the defendant kept his personal checking account, discovering some 318 checks received from patients and others deposit-

ed in the account but for which the government could find no entry on the so-called patient cards which the defendant had furnished the government. It became clear that defendant had no books, ledgers or journals as such, but kept track of his receipts from patients only on index-size cards. He had none for 1964, but during the pre-indictment investigation delivered to the revenue agents groups of cards labelled for each of the years 1965 through 1968 purporting to show receipts for each year and on the basis of which he had made up his income tax returns. None of the 318 checks appear thereon but on cross-examination of the revenue agent defense counsel produced several more boxes of similar cards labelled 1969 and following, i. e., beyond the prosecution years, to which the agent had never had access and which he had never seen. With one or two minor exceptions the 318 missing checks were found to have been posted thereon.

One of the bulwarks of the defense was, and still is, that the doctor had adopted a method of accounting whereby he did not report any income from any particular patient until he had been paid by that patient in full and then, in such year he purported to report the entire amount. For instance, if the doctor performed surgery in 1965 and billed the patient $1,000, the pattern occurred again and again that a medical insurance company promptly paid a portion of the bill. The balance, to be paid by the patient, very frequently extended over a year or two before being fully paid. So, if the patient made the last payment in 1967, for instance, the doctor's method called for reporting the entire $1,000 in that year and nothing prior thereto even though substantial amounts on the bill had been received in 1965 and 1966. Clearly this is not a recognized nor authorized method of tax accounting nor of reporting income for tax purposes, but on the question of lack of bad faith and wilful or fraudulent intent counsel obviously attempted to foundation an argument that the doctor was busy, often devoting 12 to 15 hours a day in surgery, was not an accountant, travelled widely, did not realize until his attorneys so advised him in 1969 that he was not using a proper method and that his system after all if faithfully followed would result ultimately in inclusion of all income in one year or another and thus defendant should not be accused of a criminal intent for an ignorant mistake which ultimately did little or no harm to the government. It was at least in part for this reason that it was contended that he had not given the government the patient cards for 1969 and later years, although evidence was received of a fire at his home in 1967 which destroyed or damaged some of his patient cards and that in the move to New York in 1968 or 1969 certain cards—12 boxes more or less—were packed up and could not be located when the revenue agents requested permission to inspect the records. When the government produced the 318 checks not posted to the records which the agents had been furnished, defendant countered by producing the patient cards labelled 1969 and later to show an actual posting but non-inclusion in prior years income tax returns because at time of receipt of the money and partial payments in the indictment years of 1965 through 1968 the patient had not yet paid in full and thus the cards and the postings representing receipt of moneys were carried over to years beyond the prosecution years here involved.

During the course of the trial and particularly over a weekend the prosecution apparently examined the newly produced patient cards and at following court sessions called two questioned documents examiners, one from the Bureau of Criminal Apprehension in St. Paul, Minnesota, the other an employee of the Treasury Department from Washington, D. C. With enlarged photos, some taken with infra red rays, they gave evidence that as to 32 of the newly produced patient cards which they had examined, all had in fact been altered. For instance, a typical patient card where surgery had

been done and some payment had been made in the year 1965 originally showed the final payment in full in 1967 as an example with an entry then made "Balance 0". At some later date, however, with different ink and a discernible difference in style of writing, etc., the figure "1" was added before the "0" and another "0" added to show a balance of $100. The evidence of these alterations was forceful and the jury readily could find that they had been made at a later date and by the defendant himself. Further, many of the altered cards showed a notation of two or three collection letters presumably sent to the patient over a period of months or years with a final entry "Balance cancelled", the latter entry being made to appear in the year of 1969 or thereafter beyond the indictment years. The government located approximately 20 patients, subpoenaed them to the witness stand. Each was a patient who matched one of the altered cards. They verified the date of the final payment of their bills (in each instance during the prosecution years) and denied that they ever received any further bills or collection letters or were ever dunned by the doctor. On this evidence the jury well might— and apparently did—find that the doctor was not even faithful to and did not follow and in fact falsified his own unorthodox accounting and reporting method. This demonstration to the jury may well have taken the force out of the doctor's "busy man-prominent personage—ignorance of accounting method" arguments. No real challenge ever was adduced or attempted to be adduced by way of explanation for these altered cards and though the court instructed the jury that the burden of proof beyond a reasonable doubt always rests on the government and the defendant has no duty to produce any evidence or offer any witnesses, this evidence standing unexplained and unrebutted was sufficient to permit the jury to conclude fraud and criminal intent beyond a reasonable doubt.

The above rather lengthy explanation has been made because on this motion for acquittal or for a new trial the defendant continues to make much of the defendant's method of accounting and the fact that under applicable internal revenue regulations for purpose of reporting civil income tax liability a taxpayer cannot change his method of accounting without specific authorization from the Internal Revenue Service.[1] Of necessity counsel largely glosses over the altered patient cards and the fact that the doctor quite apparently did not even follow his own method. The government contends that the method of accounting is not involved here at all, but merely the method of reporting income to the government irrespective of whatever method of accounting is employed. This latter position seems to the court to have merit. The defense cites a brief excerpt from Fowler v. United States, 352 F.2d 100 (8th Cir. 1965):

> "The government was bound to follow appellants' method of accounting in computing taxable income."

*Fowler* cites an earlier case of Morrison v. United States, 270 F.2d 1 (4th Cir.

---

1. Revenue Regulation § 1.446–1(e)(2)(i), originating with TC 6282, approved December 19, 1957, and republished as TD 6500, November 9, 1969, stated:

   "Except as otherwise expressly provided in Chapter 1 of the Code and the regulations thereunder, a taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such new method for purposes of taxation, secure the consent of the Commissioner. A change in the method of accounting includes a change in the over-all method of accounting for gross income or deductions, or a change in the treatment of a material item. *Consent must be secured whether or not a taxpayer regards the method from which he desires to change to be proper. Thus, a taxpayer may not compute his taxable income under a method of accounting different from that previously used by him unless such consent is secured.*" [Emphasis added] The regulation was amended in 1971 (after the years here involved) and continues to read much the same.

1959), cert. denied 361 U.S. 894, 80 S.Ct. 196, 4 L.Ed.2d 150 (1959).

█ This argument can be put to rest by stating that in the court's opinion, even had the government attempted to stay meticulously by the doctor's own method, the jury could find beyond a reasonable doubt that defendant fraudulently falsified the patient cards which were not revealed until trial and disclosed that he did not adhere to his own method. Apart from such, however, the *Fowler* and *Morrison* cases are in an entirely different setting. There where a taxpayer for instance is on a cash basis —and this was the basis the doctor either erroneously or falsely checked on his income tax return as the one he used —the government cannot fairly put him on an accrual basis or vice versa, and claim more income because thereof and charge criminal responsibility. Though for civil tax purposes a change of accounting methods clearly does require an application to and permission to change from the Internal Revenue Service, such can hardly be said to apply in a criminal case to some hybrid, unrecognized, unorthodox and not faithfully followed method such as the defendant employed. From a pure accounting theory, of course the defendant's method was not sound because it fails to match expenses with income in the same year. His deductions were taken on a cash current basis each year but of course did not offset or match the resultant income reported some years later, and vice versa. The court left the issue of honesty and criminal intent in reporting income for the jury. Defense counsel without objection argued his accounting theory at some length, even citing the section of the Internal Revenue Code relative to requiring permission for a change of methods. The court did not feel obliged, however, to instruct the jury as defendant requested, for to have done so would have been to misstate the applicable law in the court's opinion.

█ Error is charged in the way the court permitted evidence from the government of alleged fraudulent deductions and its failure fully to instruct the jury thereon.

As stated above the government adduced evidence of some 40 instances, more or less (many involving the same people in different years) of claimed unauthorized and fraudulent deductions. Defendant's counsel consistently took the position that where as in civil tax cases the taxpayer must substantiate the basis for his claimed deductions and without such they will be disallowed, yet in criminal cases no burden rests on the defendant to adduce any evidence nor produce any witnesses as to deductions or otherwise; that the government must produce evidence from which a jury might find beyond a reasonable doubt that any deduction is illegal. The court takes no real issue with this approach, see United States v. Bass, 425 F.2d 161 (7th Cir. 1970), and in general terms more than once instructed the jury that defendant had no burden to produce evidence, or call witnesses. It is not beyond the purview of the court's responsibility however to assume that jurors in this modern time have at least a minimal understanding of the income tax laws and concept and by the use of their common sense and experience know, for instance, that professional dancing lessons for defendant and his wife—characterized in his income tax return as "additional professional services, secretarial and maid help"—or payment to an animal hospital for treatment to the family cat "Tinkerbell"—characterized in the tax return as "drugs and pharmaceutical supplies"— are not a proper business expense or deductible items and are not properly characterized. Had the court decided to instruct on these and many other items rather than leave it to the jury's good judgment, general knowledge and common sense, it would have had to instruct that such clearly were not allowable deductions and in effect direct a verdict against defendant on these issues. The court did not feel at liberty to do this and so permitted both sides to argue the question and left the resolution to the

jury's good judgment. The record will disclose many items of the nature above: purchase of wood for the home fireplace deducted under "additional professional, secretarial and maid help"; reproduction of a "family tree" painted on the wall of the kitchen in defendant's home and later in defendant's New York apartment deducted as the same; Walgreen's drug store for miscellaneous cosmetics, photographic film, etc., (eliminating actual prescriptions) deducted as "Drugs and pharmeceutical supplies"; lawn man and gardener at the home, who testified he never served food or tended bar as "additional professional, secretarial, and maid help"; an architect to redesign the defendant's kitchen at home as "legal fees $250"; a home repair of a television set as "Miscellaneous office supplies, disposable instruments and repairs". The list goes on to include deductions for children's piano lessons, household help, payment of fairly substantial amounts for children's tuition at the University of Minnesota and elsewhere, deducted as "Miscellaneous office supplies, disposable instruments and repairs" in at least one instance; interior decorator repairing, among other things, a spinning wheel; boat storage charges at a marina characterized as "attorney's fees"; wallpaper purchase for home, as "Depreciation credenza". All items are of course not so clear as the above. One substantial item of $739.89 was deducted as "entertainment for professional colleagues". This represented a golden wedding party for the defendant's parents held at the Town and Country Club, at which it was established that a number of doctors presumably who refer patients to defendant were present and entertained, though that obviously was not the main focus of the event. Defendant's counsel made no attempt to portion or pro rate this as to amount that could or should be allowed, consistently taking the position that it was up to the government to show beyond a reasonable doubt that the entire amount was not deductible or else it was error for the court to receive the evidence at all. A substantial amount of household help was from time to time over the five years here involved charged to and deducted as "entertainment", though the individual's testimony for the most part was to the contrary. Defendant did maintain an office in his home and might be or might have been, privileged to charge some percentage of overall home expenses, which amount defendant never attempted to establish however, but made reference only in general terms. This percentage in any event would not be large if measured against the total area of the home. In view of the government's showing generally on the question of deductions and what the jury could find to be deliberate masking and misstatement of them in his tax returns, the court does not perceive any error in the evidence that was received as to some few of the deductions where there might be some question about a portion thereof.

■ In connection with the deductions, particular complaint was made that the court admitted testimony from four women called by the government to whom the doctor had made payments by check and whose testimony indicated at least in three instances a rather personal relationship with the defendant. As to the first one called, the court's notes show that after her statement as to her activities objection was made by defendant's counsel, but no motion to strike the testimony was lodged. The various amounts paid from $100 to $500 were deducted on defendant's returns as "additional professional secretarial and maid help". The court need not restate the evidence here since the same is contained in full in the record. This feature of the case of course attracted the attention of and was featured in the press and news media and was brought out before the altered patient card evidence. The government asserted it was designed to show intent on defendant's part. It seems to the court this was

proper, that the government was entitled to so show and that no error occurred here. The court did prohibit the government from eliciting anything but the barest of facts from these four witnesses, one of whom at least was prepared to testify somewhat further. The court recognized that defendant was not on trial for a morals offense and that clearly evidence of this type generally could not be introduced merely to blacken a taxpayer's name or make the case sensational. But where the deductions are so patently false and are included in the return, certainly the government is entitled to show the true nature of the services and the person's relationship as evidence of a dishonest intention to cheat the government by including something as a deduction that no reasonable man could believe to be even remotely connected with business expense. This was not mere peripheral evidence of being involved in some questionable activity but went right to the heart of the question of whether the government should be permitted to collect a tax on such amounts or be thwarted by defendant's deliberate attempt to deceive. The court perceives no error here.

Defendant also claimed many charitable deductions totalling over $4,500 with which the government took issue. He so deducted the cost of tickets to the football games at the University of Minnesota; tuition for his children's education, in part evidenced by many checks to the University of Minnesota; Concordia College Language Camp for one or more child, and some tuition at Cornell University. No great issue is made of these items on the motion for acquittal or new trial but they were further evidence for the jury's consideration as to defendant's intent.

██ Evidence was adduced of honoraria and miscellaneous fees in the amount of some $10,000 which were omitted from defendant's income over the years. So far as $3,600 for writing and editing articles received from "Hospital Publications, Inc." there can be little question that the same was income for services rendered. The honoraria in amounts usually between $100 and $150 were received by defendant typically after delivering a lecture to a medical association or meeting somewhere in the United States. He claims these were gifts and not income and so not includable in his return, though on at least two or three occasions he wrote suggesting the amount of the honorarium or reminding that no check for the honorarium had been received. This question was argued to the jury and it seemed so clear to the court that such receipts were related to his professional activities and were paid for physical appearances actually made and thus services indigenous to his occupation that any reasonable person would have to consider such as income. Even of course if they were not income but true gifts, the amount in relation to the total involvement in the case is so small that it hardly augurs for a judgment of acquittal or new trial but would seem at best to be harmless error. Again the court did not instruct the jury on this question, feeling that if it did it would have to couch it in such terms as virtually to direct a verdict against defendant on this issue; and this the court declined to do. Defendant's counsel cites a number of cases going to the question of a gift as distinguished from income items. None are in the factual setting of this case however and to the court do not seem a precedent for honoraria received under these circumstances. The court believes the circumstances were such as fairly to indicate these items to be income within the meaning of Dillon v. United States, 218 F.2d 97 (8th Cir. 1955), and receipt of the evidence did not cast the burden of disproof on defendant.

As to excluded interest income of $5,594 where the returns said "none" there can be little doubt. It was open to defendant of course to explain ignorance or neglect on his part because some or perhaps all of the interest was not paid

in cash but was accrued to savings and similar accounts; though defendant was mailed copies of the reporting forms 1099 sent by the payors to the government. A reference was made, but no real attempt to produce evidence to this effect. The government made a showing on which the jury could find beyond a reasonable doubt that interest items were not included in defendant's tax returns.

Defendant was reimbursed on many occasions for travel expense, principally for attending medical meetings, where he also claimed the amount as a deduction on his returns. Over the years defendant claimed more than 110 deductions as travelling expenses but was reimbursed some 86 times more or less —none or almost none of which reimbursements he reported. Probably the largest deduction was $1,241.50 travel and expense for attending a medical meeting and seminar in Capetown, South Africa. Uncontradicted evidence was introduced from the overseas airline that the airline ticket was purchased and paid for by the Capetown Provisional Administration in South Africa and was not paid by defendant. Further, there were charged off such items as a skiing trip to Twin Falls, Idaho for defendant's wife and three children where the defendant was not in attendance and no medical meeting was held. Defendant charged off and deducted $458.08 as hotel expense at the time of the annual meeting of the American College of Cardiology, of which he was at one time president, when in fact the College paid the bill. The government has adduced as exhibits Z–5 through Z 8–4, some ten pages, detailing these items and a further recital of them is not necessary here. A witness from Cornell University testified to a long list of items of expense and travel paid by that University or charged by defendant to its air travel card, which expenses defendant nevertheless deducted as though he had paid them himself. He made no accounting if there was any reimbursement. A taxpayer can of course make a mistake, but the jury might it seems to the court reasonably believe that the frequency with which defendant failed to include reimbursements and/or deducted improper items that were not truly travel expense, foundationed a belief beyond a reasonable doubt that such was done deliberately and with intent to defraud the government and not by mistake or inadvertence.

■ Error is assigned to the court's refusal to admit into evidence defendant's 1971 income tax return, filed approximately six months after the return of the indictment in this case. The offer was designed apparently to show either or both that defendant was still following his singular method of accounting—though admittedly advised by his attorneys in 1969 that it was not a proper method for tax purposes—or that it included income on which a tax of some $84,000 was paid and which income the government had, on a cash basis, moved back into the period 1964 through 1968. The court was and is of the view that in most cases a consistent course of conduct in certain instances may be shown both before and after the indictable events; thus defendant's 1969 and 1970 returns were received in evidence. Anything filed post indictment however was self-serving, had no real probative value and at best would but confuse the jury. Obviously the payment of a large sum of money for taxes after the indictment has been returned is not relevant to the question of criminal intent or false returns during the indicted years. The court sees no error here.

■ Defendant sought in his own case, through a colleague professor in the medical school at the University of Minnesota, to introduce pictures of defendant operating on a heart patient appearing in LIFE magazine in 1954 and a collection of articles in HARPER'S Bazaar and other magazines published from 1954 to 1958 proclaiming the virtues of defendant as a doctor and displaying the great work he was doing in

the medical field and at the University of Minnesota. Also offered were defendant's Exhibits 60, 61, 61A, 61B, 65 and 66. The latter two were magazine publications in 1972, four years after the indictment years and Exhibits 60 and 61 were narratives written by someone other than defendant and apart from a hearsay objection, the same were excludable for reasons of relevancy in any event. The court excluded all these proffered exhibits *first* because they were remote from and long prior to the years involved in the indictment (or in two cases after the indictment years) and could not be relevant to establish a basis as to how busy the doctor was during the indictment years as an excuse for income tax aberrations and *second* because in any event such evidence could not constitute a real defense of any kind. Everyone, including the government acknowledged that the doctor is and was a pioneer in the field of so-called "open heart" surgery; that he trained many famous men around the world who are now carrying on this work as well as organ transplants; that he has saved perhaps hundreds of lives; that his citations and awards are legion; that his list of published articles and works comprise a catalogue in themselves (which the court admitted as defendants Exhibit 59) and that he has been one of the world's 100 most outstanding men in the medical field. All of this however has no real relevance to whether or not he defrauded the government in his income tax filings. No man, no matter how great in his own field is above the law nor can he be excused merely because of prominence in business, the arts or a profession. The admission of such evidence as proffered would only go to appeal to the sympathy or passion and prejudice of the jury and not bear on the real issues.

The same reasoning caused the court to exclude from evidence after being shown to the court out of the jury's presence a 28 minute movie showing the doctor in an actual open heart operation and advertising the so-called Lillehei-Kaster heart valve. This could add nothing to the case and at best but leave the jury in awe of the wonders and complications of medicine, the human body and those who are able to understand it and conquer it and cure its ills; it may contain a great humanitarian appeal, but has no relevance to payment or non-payment of taxes.

One ingenious point on which defendant's counsel lays great stress is a claimed charitable deduction in the amount of $500,000 which defendant did not take on his 1965 income tax return but which when utilized that year and carried forward for the next three indictment years would wipe out all tax owed by defendant to the government and according to defendant's argument would leave the government owing defendant money by way of a refund. Under the law, no amount more than 30% of total taxable income can be deducted in any one year as a charitable contribution, but if the amount exceeds such, the balance may be carried forward as a deduction on returns for a limited number of following years unless sooner exhausted. Defendant claims that if the deduction here were in fact only $130,667.76 it would be sufficient to leave defendant owing no tax for 1965 through 1968. He then argues that 1964, standing alone, would not warrant a conviction. This was elaborately argued to the jury but the jurors obviously rejected it. Defendant's Ex. 80 scheduled the results of this concept year by year and the court received it in evidence, although on reflection the court might well have excluded it and the entire concept without error. Again the court did not instruct as to what constitutes a charitable deduction because it saw no real merit in the contention.

The facts are substantially as follows: George W. Fornell was called as a witness by defendant and testified he was the patent administrator for the University of Minnesota; that his office keeps

contact with various research programs being carried on at the University concerning patentability of discoveries; that if such have economic possibilities, the University will attend to securing a patent if possible and then will arrange licenses with private industry for manufacture and marketing. Defendant in 1961 invented a heart-lung machine which is now commercially manufactured and sold, yielding license fees or royalties of $14,000 to $17,000 per year to the University, of which it pays the inventor 25% under its then prevailing policy. Defendant thus could have received some income from this source but at least until the time he left the University to go to Cornell his share of royalties at his request went into the medical research fund.

Coming to the deduction here claimed, in 1965 a pivoting disc heart valve for insertion in a patient was invented, largely apparently by one Kaster an engineer working in the doctor's laboratory and under his direction. On inquiry, Fornell testified defendant acknowledged Kaster was the real and sole inventor, but that the defendant was willing to lend his name to the marketing of the invention so it could be known as the Lillehei-Kaster heart valve. A patent later was issued and assigned to the Regents of the University of Minnesota. After an abortive commercial attempt to put the invention into production, a license agreement was issued to Medical Manufacturing Company who some six years later and in 1971 began to market the product. Fornell gave his opinion that the permission to use the name Lillehei had a value of $500,000 considering his stature and reputation.

Defendant then called to the witness stand one Marshall Kriesel, President of Medical Manufacturing Co. who enthused about the product and its sales since 1971. He stated one-half million dollar gross sales had been effected to July 1972 since coming on the market. He similarly gave his opinion that the value of the Lillehei name was worth $500,000, though he pays the University of Minnesota but a five per cent royalty on gross sales (circa $25,000 to July 1972) and which of course if the defendant were the inventor he would receive 25%, i. e., $6,250 and this presumably, if Fornell's testimony as to the University policy were followed would in some way be divided between Lillehei and Kaster. Sales would have to reach astronomical proportions before it could be said that the value of the Lillehei name was anywhere near $500,000 or even the $136,666.67 claimed sufficient for tax deductible purposes by defendant. The claim was and is preposterous. The court did not however attempt to instruct the jury to disregard it but let it be argued in the final arguments and submitted in such fashion to the jurors. Again the court sought to avoid in effect directing a verdict against defendant on this issue.

■■ The use of the name and its value it would seem to the court has to be rather directly in proportion to what the net financial return is and might reasonably be expected to be on the device to which the name is attached at the time of the alleged gift. It can have no greater value than what it will earn net. Further, at the time in 1965 when defendant consented to his name's use, it was entirely speculative and remote whether the product would ever be marketed or would ever sell or have any commercial value, be obsoleted by a later invention, etc. Certainly in any event, if the use of the name does have value, it would be so minimal in this case as not to affect materially the substantial amount of income omitted by defendant in his various tax returns. This court has recognized in a different context that a person does have a property interest in his name. Uhlaender v. Henricksen, 316 F.Supp. 1277 (D.Minn.1970), and cases therein cited, but does not perceive for the reasons above stated that any error occurred in the way the court treated this matter, considering that at best it could not have had any reasona-

bly determinable market value at time of the alleged gift. Finally, the jury did have all the evidence on this point before them, and mere failure to instruct would not prevent it from subscribing to defendant's theory if it were so impressed.

In the broad and overall, the court believes defendant had a fair trial. There was no attempted defense sought to be raised which the court excluded from evidence. Counsel's quarrel is with a peripheral matter, namely the way the court handled the matter once the evidence was adduced. The court did its best not to deprecate nor impugn the possible defenses and they were fairly left to the jury for its consideration. The court admitted into evidence nearly everything defendant's counsel produced. In fact the government rarely objected. If errors occurred such were minimal, non prejudicial and harmless considering the rather clearly admissible evidence which established overwhelming guilt. On balance in the court's judgment defendant had a fair trial. In judging a case such as this, a court should not look only at the individual trees, but must draw himself far enough away to be able to see the forest as a whole and make a judgment thereon. Combining the defendant's use of an unauthorized accounting method, the altered patients cards, the mischaracterization and false statement of deductions, the failure to include travel and expense reimbursement, interest and miscellaneous income and all of the circumstances of the case, the jury was warranted in finding that the evidence showed defendant guilty beyond a reasonable doubt.

Other errors assigned by defendant have been considered but in the court's opinion have no merit.

Defendant shall present himself with his counsel before the court for sentencing *April 26, 1973 at Minneapolis, Minnesota at 9:00 A.M.*

A separate order denying defendant's alternative motion for a judgment of acquittal or for a new trial has been entered.